IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| AARON P. STULL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-1200-RJD |
| | ) | |
| DR. M. SIDDIQUI, DR. JOHN COE, M. MOLDENHAUER, HOLLY HAWKINS, and FRANK LAWRENCE, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

**DALY, Magistrate Judge:**

Plaintiff Aaron P. Stull, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), brings this lawsuit pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated while he was incarcerated at Menard Correctional Center ("Menard"). Plaintiff alleges he was provided inadequate medical treatment for his diabetes. Plaintiff is proceeding in this case on an Eighth Amendment deliberate indifference claim against Defendants Dr. Siddiqui, Dr. Coe, Nurse Moldenhauer, and Nurse Hawkins for denying Plaintiff adequate medical treatment for his diabetes in 2017, resulting in elevated blood glucose levels, vision loss, nerve damage, and pain. Menard Warden Frank Lawrence[1] is named as a defendant only in his official capacity for purposes of carrying out any injunctive relief, if necessary.

Now before the Court is Plaintiff's Motion to Exclude Defendants' Expert (Doc. 88), and Defendants' Motions for Summary Judgment (Docs. 98 and 101). For the reasons set forth

---

[1] Pursuant to Federal Rule of Civil Procedure 25, Frank Lawrence, whom Defendants represent is the current warden of Menard Correctional Center, is automatically substituted for Jacqueline Lashbrook. To the extend Lawrence is no longer the current Warden of Menard, under Rule 25, this Order is applicable to the current warden.

below, Plaintiff's Motion to Exclude is **DENIED**, and Defendants' Motions for Summary Judgment are **GRANTED**.

## **MOTION TO EXCLUDE DEFENDANTS' EXPERT (Doc. 88)**

Plaintiff asserts that Defendants' expert, Dr. John Daniels, should be excluded because his assessment, opinion, and possible testimony impermissibly embrace a legal conclusion and are not properly based on his regular professional work outside of his "paid litigation." In support of his argument, Plaintiff points to certain opinions included in Dr. Daniels' assessment. For example, Plaintiff takes issue with Dr. Daniels' proposition that he likely developed diabetes as early as 2006, based on the timing of Plaintiff's complaints of neuropathy. Plaintiff asserts this is based on a guess, not facts. Plaintiff also contends that Dr. Daniels' opinion that his blood glucose deteriorated in March 2017, likely because of poor dietary habits evidenced by his commissary purchases, is misplaced. Plaintiff asserts that other records evidence that his blood glucose level was previously lower (in the "8's") and his commissary records demonstrate he was purchasing the same types of foods during this earlier period. Finally, Plaintiff asserts Dr. Daniels' conclusion that the Metformin was appropriately ordered, that the gap in receipt of Metformin, and any perceived delay in follow-up appointments did not cause Plaintiff any harm nor did it exacerbate Plaintiff's condition, is improper.

In response to Plaintiff's motion, Defendants Dr. Siddiqui, Dr. Coe, and Nurse Practitioner Moldenhauer assert that Dr. Daniels' opinions and conclusions regarding the standard of care are proper and do not include any improper legal conclusions. Defendants further contend that Dr. Daniels' opinions are based upon sufficient facts and data from Plaintiff's records, and that Dr. Daniels' methodology is reliable.

**Legal Standard**

Screening evidence is a function that lies "squarely within the purview of the trial judge." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012). When the issue is whether to admit or exclude the testimony of an expert witness, the Court's discretion is guided by Federal Rules of Evidence 702 and 703, as well as the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. Rule 703 requires that an expert employ "those kinds of facts or data" on which experts in a particular field reasonably rely. *Manpower, Inc. v. Insurance Co. of Pennsylvania*, 732 F.3d 796, 809 (7th Cir. 2013). *Daubert* laid the foundation for Rule 702, which seeks to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)).

Rule 702, as amended after *Daubert*, provides that expert testimony is admissible if offered by a witness qualified by knowledge, skill, experience, training or education, and if (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness reliably applied the principles and methods to the facts of the case. Rule 702 requires that the expert's scientific, technical, or other specialized knowledge assist the trier of fact to understand the evidence or to determine a fact in issue. Simply stated, "Rule 702 requires that expert testimony be relevant, reliable, and have a factual basis — requirements that must be met before the jury is allowed to hear and perhaps be persuaded by the expert testimony." *Lapsley*, 689 F.3d at 809.

The trial judge acts as the gatekeeper for expert testimony, and "the key to the gate is not the ultimate correctness of the expert's conclusions," rather, it is "the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431

(7th Cir. 2013). The Court's inquiry focuses "solely on principles and methodologies, not on the conclusions they generate." *Id.* (quoting *Daubert*, 509 U.S. at 595). Evaluating reliability requires a flexible inquiry. The relevant consideration is whether the testimony falls outside the range where experts might reasonably differ. *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 153-54 (1999). With respect to an expert proffered for his experience, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (citing *General Elec. v. Joiner*, 522 U.S. 136, 146 (1997)).

Notably, "[a] *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley*, 689 F.3d at 805. "If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof'." *Id.* (quoting *Daubert*, 509 U.S. at 596).

## **Discussion**

Dr. Daniels is a physician board certified in Internal Medicine and Endocrinology and Metabolism. He has over forty years of experience treating patients with diabetes, and is therefore qualified to render his opinions regarding Plaintiff's treatment. In determining whether Dr. Daniels' opinions are reliable, the focus is on his methodology, not the factual underpinnings or the substance of his conclusions. *See Smith*, 215 F.3d at 718. The Court finds Dr. Daniels properly supported his conclusions and assessment based on a review of the records, including Plaintiff's medical records, and his experience. Plaintiff's reference to certain opinions and his presentation of other evidence that he contends challenges Dr. Daniels' opinions does not cause

the Court to doubt the reliability or relevance of the same. Moreover, the Court notes it is appropriate for Dr. Daniels to opine on the standard of care and he did not set forth an improper legal conclusion. *See, e.g., Musser v. Gentiver Health Services*, 356 F.3d 751, 760 (7th Cir. 2004) (Under Indiana law, "[a] plaintiff must present expert testimony to establish the applicable standard of care and to show whether the defendant's conduct falls below the standard of care."). Although the Court is mindful of Plaintiff's concerns, he may address those concerns by cross-examination and the presentation of contrary evidence.

Based on the foregoing, Plaintiff's Motion to Exclude is **DENIED**.

## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Docs. 98 and 101)

Defendants Dr. Siddiqui, Dr. Coe, and NP Moldenhauer (the "Wexford Defendants") argue they are entitled to judgment as a matter law because Plaintiff has failed to establish that they had any actual knowledge that a substantial risk of harm existed. The Wexford Defendants also assert Plaintiff has failed to demonstrate any actual harm resulted from their alleged deliberate indifference.

Defendant Holly Hawkins asserts summary judgment should be granted because she was not personally involved in Plaintiff's medical treatment and she did not act with deliberate indifference toward Plaintiff. Hawkins also contends she is entitled to qualified immunity. Defendant Lawrence asserts summary judgment should be granted in his favor if the Court finds Hawkins is entitled to summary judgment because he was named only in his official capacity for purposes of carrying out any ordered injunctive relief.

### Factual Background

Plaintiff's claims in this matter relate to treatment of his diabetes in 2017 while he was incarcerated at Menard Correctional Center ("Menard"). By way of background, Plaintiff was

diagnosed with diabetes mellitus Type 2 while at Menard in 2013 (Plaintiff's Medical Records, Doc. 102-1 at 33; Plaintiff's Deposition, Doc. 99-1 at 7). For patients with diabetes, hemoglobin A1C testing is used to determine the level of control of a patient's blood glucose level over a two- or three-month period (Declaration of Dr. Mohammed Siddiqui, Doc. 102-4 at ¶ 15). Plaintiff's goal was to have his A1C below 7.0 (Doc. 99-1 at 5). Plaintiff was prescribed Metformin, 500 milligrams, twice a day, and began taking his prescription in July 2013 (*Id.*). In late 2015, Plaintiff complained of neuropathic pain in his left leg, including numbness and tingling, for which he was prescribed Capsazin cream (Doc. 102-1 at 34).

On February 2, 2016, a nurse practitioner examined Plaintiff and noted his diabetes was poorly controlled and his body mass index was over 40 (Doc. 99-1 at 9; Doc. 102-1 at 1). The nurse practitioner noted the Capsazin cream provided Plaintiff some relief from his neuropathic pain (*Id.*).

On May 12, 2016, Plaintiff was examined by Defendant Nurse Practitioner Michael Moldenhauer (Doc. 106 at 17). Moldenhauer indicated Plaintiff's condition was "stable" and his degree of control for his diabetes was "fair"[2] (*Id.*). At that time, Plaintiff's most recent A1C was 8.0, taken on April 7, 2016 (*Id.*). Moldenhauer prescribed Plaintiff 1,000 milligrams of Metformin to be taken twice per day (*Id.*). Plaintiff's prescription expired in one year — May 12, 2017 (Doc. 102-1 at 9). Plaintiff's A1C was 7.3 on July 7, 2016 (*Id.* at 23). On November 3, 2016, Plaintiff's A1C had risen to 7.9 (*Id.* at 24). On March 16, 2017, Plaintiff's results indicated an elevated A1C of 10.0 (*Id.* at 25).

Upon review of Plaintiff's March 16, 2017 lab tests, Moldenhauer circled "see patient ___

---

[2] In his response to Defendants' motions, Plaintiff asserts Moldenhauer indicated his control was "poor"; however, this appears to be in error based on a review of the medical record at issue.

CC," meaning Plaintiff was to be seen on next diabetes chronic care clinic (Declaration of Michael Moldenhauer, RN, NP, Doc. 102-5 at ¶¶ 15-16). Moldenhauer understood Plaintiff would be seen in the chronic care clinic in March or April 2017 because chronic care clinics occur quarterly (*Id.* at ¶ 17). Plaintiff was scheduled to be seen on April 24, 2017 on the diabetes chronic care clinic; however, his appointment was canceled because Menard was on a level one lockdown (*Id.* at ¶¶ 23-24; Doc. 102-1 at 2).

Prior to receiving his elevated A1C results from his March 16, 2017 lab tests, Plaintiff was issued his prescription for a one-month supply of Metformin on February 25, 2017 (Doc. 99-1 at 17). Plaintiff's medical records do not show that he received refills for certain medications, including his Metformin, in March or April 2017, despite having valid prescriptions (*see* Doc. 102-1 at 15-17). Plaintiff also did not receive his Capsazin cream during this time, as his prescription had lapsed (Doc. 99-1 at 15-16). Around March 2017, Plaintiff began experiencing an increase in the "crawling sensation" in his legs (*Id.* at 21). Plaintiff testified that he submitted medication requests by handing them to members of the nursing staff and was told they would be given to the healthcare unit (*Id.* at 18-19). Plaintiff's Metformin prescription was renewed by Defendant Dr. Coe on May 10, 2017 (Doc. 102-1 at 2, 19). Dr. Coe did not issue a new prescription for Plaintiff's Ibuprofen or Capsazin cream (Doc. 99-1 at 20; *see* Doc. 102-1 at 9). Dr. Coe attests that he was assisting at Menard on May 10, 2017 in his role as a PRN traveling physician, and had been asked by a member of the healthcare unit to refill the prescriptions set to expire for the patients who recently missed their chronic clinic appointments due to a lockdown (Declaration of Dr. John Coe, Doc. 102-7 at ¶¶ 6-7). Dr. Coe renewed Plaintiff's prescriptions for Clonidine, Atenolol, HCTZ, Hycosamine, Lisinopril, and Metformin as these prescriptions were about to expire (*Id.* at 9). Dr. Coe was informed that Plaintiff would be appropriately

rescheduled and seen by another medical provider (*Id.* at 11).

Plaintiff had additional blood work done on May 11, 2017. Plaintiff's A1C was not resulted, but he had an elevated glucose level of 458[3] (Doc. 102-1 at 26). Defendant Dr. Siddiqui reviewed Plaintiff's laboratory test results from May 11, 2017 on May 15, 2017 (Doc. 102-4 at ¶ 14; *see* Doc. 102-1 at 26). Dr. Siddiqui ordered that Plaintiff be seen on the next provider call line for evaluation due to his test results (Doc. 102-4 at ¶ 16; *see* Doc. 102-1 at 26). Plaintiff was provided with a one-month supply of his Metformin on May 12, 207 (Doc. 102-1 at 19).

Plaintiff was seen by Dr. Siddiqui on July 3, 2017, wherein Dr. Siddiqui addressed several of Plaintiff's medical concerns (Doc. 102-4 at ¶ 28). Plaintiff complained of extreme pain in his leg that radiated to the bottom of his foot (Doc. 99-1 at 24). Dr. Siddiqui added Glipizide to Plaintiff's medication regimen to help decrease his blood glucose levels (Doc. 102-4 at ¶ 28). Dr. Siddiqui also ordered Plaintiff to have a follow-up in one month, which occurred on August 10, 2017 (*Id.* at 30). Laboratory blood tests were taken on August 3, 2017, which indicated Plaintiff continued to have an A1C level of 10.0 (Doc. 102-1 at 30). On November 2, 2017, Plaintiff's A1C levels decreased to 7.9 (Doc. 102-1 at 31). On November 4, 2017, Plaintiff's Glipizide was increased, his Metformin was continued, and sliding scale insulin was added to his treatment regimen (Doc. 102-1 at 8, 22). Plaintiff's A1C levels have remained elevated, at or above 8.6, since March 1, 2018, and reaching 11.4 on March 22, 2019 (Doc. 102-1 at 37-41, 45).

In June and July 2017, Plaintiff submitted various grievances complaining about his diabetes treatment, including his rising A1C levels, and failure to dispense Metformin from February to April 2017 (*see* Docs. 106 at 39-48). In particular, Plaintiff filed a grievance dated June 20, 2017, wherein he complained of problems with the treatment he had been provided for his

---

[3] The reference range for glucose is 65-110 (*see* Doc. 102-1 at 26).

diabetes (Doc. 99-5 at 4-5). Plaintiff specifically mentioned issues with receipt of his Metformin, and he requested to see a physician (*Id.*). When the Grievance Officer reviewed this grievance, she discussed Plaintiff's medical care with Defendants Hawkins and Dr. Siddiqui (*see* Doc. 99-5 at 3). Plaintiff appealed this grievance to the Administrative Review Board ("ARB") (*See* Doc. 99-5 at 2). The ARB Chairperson emailed Defendant Hawkins requesting an update on Plaintiff's medical care on October 13, 2017 (*Id.* at 9). Hawkins responded that Plaintiff was seen on August 10, 2017 and his blood sugars had improved on "Glypizide" (*Id.*). Hawkins also remarked that Plaintiff would be seen for a follow-up in December (*Id.*). Defendant Dr. Siddiqui and Defendant Holly Hawkins also responded to Plaintiff's grievance dated July 19, 2017 on August 11, 2017, explaining that Plaintiff was seen by Dr. Siddiqui on August 10, 2017 and indicated his blood sugars had recently improved (Doc. 106 at 49).

***Expert Report of Dr. John S. Daniels, MC, FACP***

Dr. Daniels, an expert retained by Defendants Dr. Siddiqui, Dr. Coe, and NP Moldenhauer and a board certified physician in Internal Medicine and Endocrinology and Metabolism, provided a report assessing the treatment at issue in this lawsuit. Dr. Daniels remarked there was no evidence in the medical records that any personnel notified the nurse practitioner or the physicians that Plaintiff did not receive his Metformin as prescribed from March 27, 2017 to May 12, 2017. Dr. Daniels explained that based upon the standard of care, a physician is not obligated to follow-up with every patient to ensure that prescribed medications are administered as ordered. According to Dr. Daniels, providers have a right to rely on staff members to administer medication as ordered and rely on the patient to notify the provider of any issues regarding their prescriptions. Dr. Daniels also noted that the absence of Metformin administration during the relevant six-week period did not result in any further deterioration of Plaintiff's blood glucose control. Dr. Daniels

explained that Plaintiff's A1C prior to the Metformin stoppage was 10, and it remained at 10 twelve weeks after resuming Metformin. Overall, Dr. Daniels opined that the gap in Metformin and any perceived delay in follow-up appointments did not cause Plaintiff any harm and did not exacerbate his condition. Dr. Daniels noted that Plaintiff was seen frequently and timely, indeed, far more frequently that diabetic patients are typically seen in the private sector.

## **Legal Standards**

*Summary Judgment*

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

*Eighth Amendment Deliberate Indifference*

The Supreme Court has recognized that "deliberate indifference to serious medical needs

of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, Plaintiff must show first that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).

With regard to the first showing, the following circumstances could constitute a serious medical need: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie Cnty.,* 394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

A prisoner must also show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain'." *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even recklessness as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987). Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference.

*Greeno*, 414 F.3d at 653. A plaintiff does not have to prove that his complaints were "literally ignored," but only that "the defendants' responses were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes,* 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)).

## Discussion

### *Nurse Practitioner Michael Moldenhauer*

The evidence in the record indicates that Defendant Moldenhauer examined Plaintiff on one occasion — May 12, 2016. Moldenhauer prescribed Metformin, 1,000 milligrams, to be taken twice a day for one year. Moldenhauer later reviewed Plaintiff's laboratory test results taken on March 16, 2017, indicating an elevated A1C of 10.0. On Plaintiff's test results, Moldenhauer indicated that Plaintiff was to be seen on the next diabetes chronic care clinic, which he anticipated would occur in March or April 2017. Although Plaintiff was scheduled to be seen April 24, 2017, his appointment was canceled and he was not seen until July 3, 2017.

Plaintiff asserts that Moldenhauer's actions violated the Eighth Amendment because he should have been seen more urgently and he should not have had to wait until the next chronic care clinic to be seen by a provider. Plaintiff relies on the IDOC Administrative Directive 04.03.105 in support of his argument (Doc. 106 at 11-14). Pursuant to AD 04.03.105, "Offender's [sic] who have a chronic illness that is unstable (poor control) shall be seen more frequently at intervals determined by the physician." Notably, under this AD, the diabetes clinic is to be held every four months in April, August, and December.

Plaintiff argues his A1C reading of 10.0 indicated his condition was poorly controlled and, as such, Moldenhauer should have ensured he was seen more immediately. Plaintiff also contends several of his requests for medications were addressed to Moldenhauer, and he failed to

respond to said requests.

As a preliminary matter, the Court notes Defendants do not dispute that diabetes is a serious medical need and finds this point conceded for purposes of summary judgment. Accordingly, the crux of the issue before the Court is whether Defendant Moldenhauer acted with deliberate indifference in treating Plaintiff's condition on May 12, 2016, or following his review of Plaintiff's March 16, 2017 lab results. Moldenhauer's assessment of Plaintiff's diabetes on May 12, 2016 was that his condition was fair, given his most recent A1C reading of 8.0. Moldenhauer increased his Metformin prescription to 1,000 milligrams and advised Plaintiff to reduce his sugar intake. There is no evidence that Moldenhauer's assessment of Plaintiff or his treatment regimen was "blatantly inappropriate" or that Moldenhauer intentionally or recklessly disregarded Plaintiff's needs. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citations omitted).

The Court also finds that Moldenhauer's response to Plaintiff's March 16, 2017 laboratory results was not "blatantly inappropriate." Moldenhauer ordered Plaintiff be seen at the next diabetes chronic care clinic, which he understood would take place by April 2017. Moldenhauer attests that it is his custom and practice to rely on nursing staff to review his orders and forward them to the IDOC Medical Records Department at Menard for scheduling purposes as he does not schedule his own call lines (Doc. 102-5 at ¶ 19-20). There is no evidence that Plaintiff's condition was of an emergency nature or required immediate medical treatment. As such, the evidence demonstrates it was appropriate for Moldenhauer to schedule Plaintiff to be seen in the next four to six weeks. Plaintiff was scheduled per Moldenhauer's order, and there is no evidence Moldenhauer knew Plaintiff's April 2017 appointment was canceled due to a lockdown, or that he knew Plaintiff's appointment was not expeditiously rescheduled. Plaintiff's reliance on the IDOC Administrative Directive to establish deliberate indifference is misplaced. First, the

violation of an AD is not sufficient to demonstrate a constitutional violation. Moreover, the AD at issue merely indicates that if an inmate who has a chronic illness that is poorly controlled, he should be seen more frequently at intervals *determined by a physician* (Doc. 106 at 13). As such, Defendant Moldenhauer was entitled to rely on his medical judgment and schedule Plaintiff as he found appropriate.

Finally, with regard to Plaintiff's requests for medications, there is no evidence any such requests were received or reviewed by Moldenhauer, and, as such, Moldenhauer could not have been deliberately indifferent in failing to ensure Plaintiff received his medication. For these reasons, no reasonable jury could find that Defendant Michael Moldenhauer was deliberately indifferent and he is entitled to judgment as a matter of law.

*Dr. Mohammed Siddiqui*

When viewed in Plaintiff's favor, the evidence indicates Dr. Siddiqui became involved in Plaintiff's medical care at issue upon reviewing laboratory results indicating a high glucose level of 458 on May 15, 2017. Dr. Siddiqui ordered that Plaintiff be seen on the next provider call line for evaluation. Plaintiff was not seen until July 3, 2017. On this date, Dr. Siddiqui examined him and addressed his various medical concerns. Dr. Siddiqui added Glipizide to Plaintiff's medication regimen and ordered a one-month follow-up. Dr. Siddiqui saw Plaintiff again on August 10, 2017. Plaintiff's A1C remained elevated during this time, measuring 10.0 on August 3, 2017.

Plaintiff contends Dr. Siddiqui acted with deliberate indifference in failing to render or require immediate medical treatment, including hospitalization, upon review of his May 11, 2017 laboratory tests. In support of his argument, Plaintiff relies on the Medication Administration Record, which states as follows: "SLIDING SCALE INSULIN, Adjust with Regular Insulin, (call

MD if <60 or >450)" (Doc. 106 at 23). Plaintiff argues that because his glucose level was 458, he required hospitalization, close monitoring, and possibly insulin administration. Although Plaintiff cites to his Medication Administration Record to support his position, his reliance is misplaced. The Medication Administration Record is not an authority for diabetic treatment that Dr. Siddiqui was required to follow, nor does it require the treatment Plaintiff says it requires. Although it does indicate a physician should be called to address glucose levels greater than 450, it appears this is only required if a patient is taking sliding scale insulin. In any event, a physician, Dr. Siddiqui, did review Plaintiff's laboratory test results, and placed Plaintiff on the next provider call line.

The Court recognizes Plaintiff was not seen until July 3, 2017, despite Dr. Siddiqui's order that he be seen on the next provider call line. Dr. Siddiqui relies on nursing staff to review his entries in patients' medical records and send any orders requiring scheduling to the Medical Records Department to schedule the patient as indicated (Doc. 102-4 at ¶ 17). Dr. Siddiqui is entitled to rely on other medical personnel to carry out his directives, so long as he did not "turn a blind eye if it was obvious to [him] that other staff members were not following through on [his] orders." *Norwood v. Ghosh*, 723 F. App'x 357, 366 (7th Cir. 2018). Here, there is no indication Dr. Siddiqui was aware Plaintiff was not scheduled on the next provider call line, or that he was aware staff members were not following his orders. There is also no indication Dr. Siddiqui was aware that Plaintiff had not received his Metformin or Capsazin cream in March and April 2017. Based on the foregoing, the record demonstrates that Dr. Siddiqui's treatment of Plaintiff's condition was not "so significant a departure from accepted standard or practices" to amount to deliberate indifference under the Eighth Amendment. Accordingly, Dr. Siddiqui is entitled to judgment as a matter of law.

*Dr. John Coe*

The evidence before the Court indicates that Dr. Coe never examined or otherwise interacted with Plaintiff. Dr. Coe was only involved in Plaintiff's treatment insofar as he renewed various medications for Plaintiff that were about to expire, including his Metformin, on May 10, 2017. Plaintiff complains that Dr. Coe should have examined Plaintiff because his A1Cs had been high, but he failed to take any action. Plaintiff asserts Dr. Coe should have seen the nurse's note dated April 24, 2017 when he ordered the prescription renewals. Notably, the nurse's note indicated that Plaintiff was on the "med call line" for the diabetes chronic clinic due to elevated glucose readings, but that his appointment had to be canceled due to an institutional lockdown. The note also indicated Plaintiff was to be recalled.

No reasonable jury could find that Dr. Coe acted with deliberate indifference to Plaintiff's medical condition even when viewing the evidence in the light most favorable to Plaintiff. The nursing note entered on April 24, 2017 is insufficient to provide Dr. Coe with knowledge that Plaintiff required urgent or emergency medical treatment. Further, Dr. Coe was informed Plaintiff was to be recalled and would be seen by another provider. As such, Dr. Coe could not have drawn an inference that Plaintiff was at a substantial risk of serious harm. For this reason, Defendant Dr. Coe is entitled to judgment as a matter of law.

*Holly Hawkins*

The record is undisputed that Holly Hawkins' involvement in Plaintiff's medical treatment at issue was limited to her review and follow-up to grievances filed by Plaintiff dated June 20, 2017 and July 19, 2017. In these grievances, Plaintiff complains about medical issues that are not related to this lawsuit, and also complains that he has not received certain medications for his diabetes and had not been seen by a physician. In response to these grievances, Holly Hawkins,

the nursing supervisor, responded that Plaintiff had been seen by Dr. Siddiqui after said grievances were filed. Hawkins also indicated that Plaintiff was going to be seen again in December for a diabetic follow-up, and he had experienced an improvement in blood sugars.

Although Hawkins is a medical provider, she had no involvement in the medical care at issue. Indeed, as a nursing supervisor, Hawkins has no authority to order treatment for any offender at any time, and the treating physician makes medical decisions regarding the appropriate course of treatment for a patient (Declaration of Holly Hawkins, Doc. 99-3 at ¶¶ 7-8). As such, Hawkins was entitled to defer to the judgment of Plaintiff's treating physicians, including Dr. Siddiqui, who had examined Plaintiff following the filing of the grievances at issue. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (nonmedical personnel are entitled to defer to the judgment of health professionals so long as they do not ignore the prisoner). Plaintiff's grievances were not ignored by Hawkins. Rather, she reviewed Plaintiff's medical records and conferred with his treating providers in rendering her response to the grievances submitted by Plaintiff. In conducting her review, it was apparent Plaintiff was being treated and had recently been seen by a physician. Accordingly, no reasonable jury could find Defendant Hawkins failed to respond to a substantial risk of harm to Plaintiff's health and she is entitled to judgment as a matter of law. The Court need not consider whether Defendant Hawkins is entitled to qualified immunity because the Court finds she did not violate Plaintiff's constitutional rights.

*Warden Frank Lawrence*

Warden Lawrence is entitled to summary judgment because there are no remaining claims for which injunctive relief may be ordered.

## **CONCLUSION**

Based on the foregoing, the Motion to Exclude Defendants' Expert filed by Plaintiff (Doc.

88) is **DENIED**; the Motion for Summary Judgment filed by Defendants Menard Warden Frank Lawrence and Holly Hawkins (Doc. 98) is **GRANTED**; and the Motion for Summary Judgment filed by Defendants Dr. Mohammed Siddiqui, Dr. John Coe, and Nurse Practitioner Michael Moldenhauer (Doc. 101) is **GRANTED**. The Clerk of Court is directed to enter judgment in favor of Defendants Frank Lawrence (the Warden of Menard), Dr. Mohammed Siddiqui, Dr. John Coe, Nurse Practitioner Michael Moldenhauer, and Holly Hawkins and against Plaintiff Aaron P. Stull.

**IT IS SO ORDERED.**

**DATED: February 27, 2020**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**